# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FAUSTO LOPEZ | No. 16 CR 169<br><br>Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

Agents from the Drug Enforcement Administration stopped defendant Fausto Lopez, patted him down, and searched his garage and home. The agents found money, drugs, and a gun, Lopez made admissions, and Lopez now moves to suppress the evidence.[1]

As part of an ongoing investigation, a DEA agent interviewed a suspect who admitted that he was part of a drug trafficking organization. Tr. 16–17, 19. The agent found no incriminating evidence in the suspect's apartment (there was, however, heroin, methamphetamine, and a gun in another apartment in the same building), but the suspect nevertheless explained that he was a courier of money and drugs to and from a garage at 5122 S. Laflin in Chicago. Tr. 18–20, 37. He described his method as picking up a white car with money in it from a parking lot and taking it to the garage, where a man named Fausto received the car, took the money out, and put cocaine in the car. Tr. 20, 37. The courier then retrieved the car from Fausto and

---

[1] The facts related in this opinion are my findings based on the testimony and evidence presented at the hearing on defendant's motion, and based on inferences I have drawn from that evidence. The transcript of proceedings is cited as "Tr." followed by the page number.

returned it to the parking lot. *Id.* He said he had done this about five times, and knew that he was transporting money and drugs. Tr. 37–38. That evening, agents took the courier to 5122 S. Laflin, where he pointed out the house that he had just described. Tr. 37. The DEA did not take the courier into custody. They expected him to continue to cooperate, but he did not respond to later attempts to contact him. Tr. 20, 40. Agents did not talk to the courier again, and his was the only information agents had about a man named Fausto being involved in drug trafficking at 5122 S. Laflin. Tr. 40–41.

By the next day, agents had a picture of defendant Fausto Lopez, but they did not believe they had probable cause to get a warrant to search the house and garage. Tr. 45, 83. Their plan was to watch the Laflin property and conduct investigative stops to determine if drug traffickers operated out of that location. Tr. 44. The agents understood that if they revealed their presence to the occupants of 5122 S. Laflin, they would need to search the house before anything of evidentiary value was lost—one of their goals that day was to get inside the house, knowing that they did not have enough for a search warrant. Tr. 45, 124.

The agents set up surveillance around 5122 S. Laflin and its alley-facing garage. Tr. 82. Agent Daniel Soria saw a white van approach the garage and two men carrying paper grocery bags get out of the van. Tr. 83. While Soria thought the paper bags might be suspicious, the carrying of paper bags outside the garage was not consistent with the courier's report that a white car delivered money inside the

2

garage. Tr. 83, 101. Soria recognized one of the men as Fausto Lopez. Tr. 83. The two men went inside the garage and then Lopez began to drive away in the van, down the alley. Tr. 55, 83. Soria instructed agents to stop the van. Tr. 108. Defendant Lopez was partway down the alley, a few lots away from his garage, when he was blocked by agents' cars—one behind the van and one in front (with emergency lights activated). Tr. 56, 65–66. An officer commanded Lopez to get out of the van, and he complied. The officer may have phrased his directions as requests, but in his testimony, he acknowledged that he was giving commands to Lopez. Tr. 69.

This was a seizure. The police conduct—boxing Lopez in, signaling with emergency lights, and commanding him to get out of the van—"would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *United States v. Smith*, 794 F.3d 681, 684 (7th Cir. 2015) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). But it was not an unconstitutional seizure because the agents had a reasonable suspicion that the man in the van had committed a drug felony—the distribution of drugs and drug money on approximately five occasions as described by the courier. No agent observed Lopez committing a crime, nor was what they saw (carrying paper bags) sufficient to suggest a crime was afoot that very minute, but officers can stop and detain a suspect for reasonable suspicion that the suspect has engaged in a completed felony. *United States v. Bullock*, 632 F.3d 1004, 1014 (7th Cir. 2011) (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985)). The courier's self-incriminating statements were untested,

3

but sufficient for the agents to reasonably suspect that Lopez was involved in a significant drug trafficking operation. Inculpatory statements from one suspect, even if not yet proven reliable, provide a weighty justification to detain an accomplice. *United States v. Brown*, 366 F.3d 456, 459 (7th Cir. 2004). This was not a case of agents transferring mere suspicion of illegal activity at a particular place to anyone who leaves that property as in *United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012). The agents had specific, articulable facts tying Fausto Lopez to drug trafficking at 5122 S. Laflin, and when they saw a person they believed to be Fausto Lopez, they could—consistent with the Constitution—stop and detain him for further investigation, to include determining his identity.

As requested, Lopez placed his hands on the van and the officer patted him down. Tr. 57, 69. He found no weapons or contraband on Lopez. "An officer conducting a lawful *Terry* stop may not automatically frisk the subject of the stop." *United States v. Thompson*, No. 16-1105, 2016 WL 6882840, at *3 (7th Cir. Nov. 22, 2016); *see Terry v. Ohio*, 392 U.S. 1, 24 (1968). There must be some articulable suspicion that the subject might be armed and dangerous. *Id.* The court of appeals has often said that guns and drugs go hand in hand, and that suspicion that someone is participating in a drug trafficking operation provides suspicion that the same person is armed. *See Thompson*, 2016 WL 6882840, at *3. But that general proposition does not justify the frisk in this case. The agents had no information that Lopez was in the middle of conducting a drug deal, or that he had just completed

4

one—signs that might suggest that he would be carrying the tools of the drug trade. Nothing they saw matched the drug-dealing method described by the courier. Nor did the agents have information suggesting that Lopez was the kind of drug dealer, for example a street-level dealer regularly exposed to risky situations, who one would expect to be armed at all times. They reasonably suspected that Lopez previously committed drug distribution crimes (at some unspecified time in the past), but they did not have information indicating that he was armed and dangerous at that moment. Agents conducting drug investigations do not have free rein to frisk all suspects; they should protect themselves, but they should also understand that the Fourth Amendment may prevent them from using evidence obtained as a result of their conduct. *See United States v. Johnson*, 170 F.3d 708, 721 (7th Cir. 1999) (Evans, J., concurring). The frisk of Lopez was unconstitutional, but not flagrantly so—dangerous situations abound in drug investigations, and erring on the side of agent safety here was not an intentional violation of *Terry*.

No evidence was obtained directly from the frisk, but Lopez's encounter with the agents continued. The question, then, is whether the illegality of the frisk tainted the remainder of the encounter and vitiated Lopez's consent to the later searches. *See United States v. Pedroza*, 269 F.3d 821, 827 (7th Cir. 2001). It did not, because, as explained below, the searches were sufficiently attenuated from the frisk.

The officer who stopped Lopez spoke Spanish, asked to check Lopez's van for anything illegal, and Lopez said he did not mind.[2] Tr. 56–57. The officer then told Lopez that they needed to go back to Lopez's garage. Tr. 71. He phrased this as a request, and Lopez agreed, Tr. 58, 77, but like this officer's other requests of Lopez, this was equivalent to a command—a gentle one, but in light of the officer's testimony that Lopez was not free to go, Tr. 71, a command nonetheless. Two agents walked with Lopez back to the garage, and I credit the officer's testimony that they did not touch Lopez on the walk back. This continued detention was permissible. The investigation following a *Terry* stop must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance. *Matz v. Klotka*, 769 F.3d 517, 524–25 (7th Cir. 2014). Directing Lopez back to his garage took only a few moments (the length of a few city lots), was directly tied to the suspicion that the garage was the location of drug trafficking activity, and was barely intrusive since Lopez had just left that location and, as Lopez would later confirm, 5122 S. Laflin was his home. *See United States v. Bullock*, 632 F.3d 1004, 1016–17 (7th Cir. 2011).

Back at the garage, Soria told Lopez (in Spanish) that the police were conducting an investigation, Lopez was not under arrest, and Lopez did not have to

---

[2] Lopez voluntarily consented to the search of the van—a search that produced no evidence at issue here. His detention and frisk weigh toward finding that he was not in a position to refuse, but the other circumstances demonstrate that his permission was freely given. His detention was lawful, the officer was not aggressive, and Lopez was cooperative. The officer later drove the van back to the garage and this was a reasonable step to take as part of the investigation—it kept the van close to Lopez, returned it to Lopez's property, and did not apply any coercive pressure on Lopez to cooperate.

6

talk to Soria.³ Tr. 87. Lopez's version of events diverges from the agents', and I credit the agents'. The agents readily admitted that they did not have probable cause and that they wanted to conduct a search. Based on Soria's experience conducting interdictions of travelers, I infer that Soria knew that if he overcame Lopez's will and extracted an involuntary consent, then no viable prosecution of Lopez would result. The agents had an incentive to act diplomatically. In addition, Lopez confirmed that the agents did not search the garage until after he was brought to the garage. Tr. 227. This corroborates the notion that the agents conducted themselves appropriately; they did not act until obtaining permission from Lopez. Lopez's testimony that Soria told him that the agents were going to search the garage and home—without asking—and that the agents said they would destroy the house if Lopez did not show them the contraband is not credible. With hindsight, and with the present prosecution looming over him, Lopez has re-characterized the agents' statements to be a more extreme version of their actual conduct.

Soria asked Lopez if he could ask him some questions, and Lopez agreed. Tr. 88. This questioning was tailored to the purpose of the investigative stop, and did not extend Lopez's detention any longer than was necessary to effectuate its purpose

---

³ Soria entered the garage when Lopez's brother opened the door, and after Lopez had driven away in the van. Tr. 110–11. Lopez used the detached garage to conduct an auto-repair business and made the garage available to customers, Tr. 224, but it is not likely that this business was open to the public generally. Soria's warrantless entry into the garage was not supported by probable cause, consent, or exigency, but his misstep was also not flagrant nor designed to pressure Lopez (who was not present). Soria's purpose was to conduct a search, but one based voluntary consent—a legitimate goal.

7

(namely, to ask some questions about what Lopez was up to in his garage). *Cf. United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (questioning that prolongs detention and is unjustified by stop's purpose is unreasonable). There is no indication that Soria knew that another officer patted Lopez down, and so Soria did not exploit the patdown to extract consent. *See Pedroza*, 269 F.3d at 828. Lopez, of course, knew he had been frisked and his car searched, but he also knew that those searches bore no fruit. The illegal frisk, while recent in time, was not material to Lopez's interaction with Soria, was not intended to pressure Lopez (it was a generalized safety precaution), and was not an act of flagrant misconduct. Lopez was detained and in the presence of several agents in his garage, and these circumstances likely contributed to a tense atmosphere from Lopez's perspective. But the detention was not unlawful and was consistent with the minimal intrusion necessary to dispel the agents of their reasonable suspicion that Lopez used the garage for drug trafficking. In sum, Soria's conversation with Lopez was an intervening event that separated the frisk from later events. Lopez agreed to let the investigation continue, and this was an informed choice he voluntarily made.

Lopez knew that he had drugs, money, and a gun in the house, but he did not know how much the investigators knew about his activities. Under these circumstances, it was entirely rational for Lopez to cooperate and make a choice to assist, instead of resist. Cooperation could cause the investigators to focus their

8

attention elsewhere.[4] By engaging with the agents, Lopez could learn what they knew, and rationally hope that they might not find the incriminating evidence. Lopez's testimony that he felt he didn't have a choice—that he could not say no to the police—was perhaps colloquially true in the sense that his options were limited. He was now on their radar, he had drugs and a gun in the home, and he had no lawful permission to be in this country. Cooperating and hoping for the best of a bad situation may not have felt ideal, but it was a voluntary choice.

Soria asked three separate questions, asking whether there were any guns, drugs, or large amounts of currency in the garage. Tr. 88. To each question, Lopez replied in the negative. *Id*. Soria again told Lopez that he was not under arrest and then asked Lopez "if it was okay if we looked in the garage for those items that he said he didn't have inside the garage." *Id*. Soria did not use a readily available Spanish language consent-to-search form, and instead phrased his request oddly—asking Lopez if agents could look for things Lopez said were not there. Although Soria could not recall Lopez's precise words, Lopez gave permission for

---

[4] As the courier learned the night before, sometimes giving agents information causes them to move on and allow the cooperator to remain free. Of course, Lopez did not know that this tactic worked for the courier, but it serves as an example of why, as a general matter, cooperation can be a rational choice.

9

agents to search.[5] And so they did. The paper bags Soria had seen earlier contained auto parts; agents found nothing of evidentiary value in the garage.[6] Tr. 89.

Lopez's consent to search the garage was voluntary. First, it was not tainted by any illegality. Lopez's detention was lawful, and his consent was attenuated from the relatively minor intrusion of the frisk—separated by a change in personnel dealing with Lopez and by Soria's admonitions that Lopez was not under arrest and not required to answer questions. The same admonitions also provided a break from Soria's initial entry into the garage by giving Lopez a clear opportunity to end the encounter. Things happened quickly, but the lack of flagrant misconduct by the agents and the intervening circumstances of Soria's admonitions gave Lopez a clean slate. Second, the remaining relevant factors, *see Thompson*, 2016 WL 6882840, at *5, lead me to conclude that Lopez's consent was voluntary. He was told he was not under arrest and that he did not need to answer questions. Soria's demeanor was calm, no threats were uttered, no weapons were drawn, and Soria did not press

---

[5] Soria thought Lopez said something to the effect of, "Yeah, fine. No problem. Search." Tr. 88. Lopez testified that he told the agents that the search was "all right." Tr. 212. While I do not credit most of Lopez's description of Soria's statements, I do credit Lopez's testimony that he indicated that it was okay to search. Lopez's point is not that he did not utter words of consent, but that his words were involuntary.

[6] Lopez's brother's testimony at the suppression hearing was immaterial. When Lopez was present in the garage, the brother did not hear what the agent said to Lopez or what Lopez said in return, Tr. 169, so the brother sheds no light on their interaction. At most, his testimony confirms that the agent speaking to Lopez was not raising his voice. Whether the agents had their weapons drawn when they entered the garage is not material to the questions surrounding Lopez's interactions with the agents, because Lopez was not present. Lopez's decisions were not informed by any show of force displayed upon entry, and I find Soria credible with respect to his description of his conversations with Lopez.

repeatedly for consent. The physical presence of several agents in and near Lopez's property did not compromise his faculties or free will. Soria's request was not as simply phrased as it could have been, and it would have been clearer if Soria had just presented Lopez with the consent form. But Lopez replied that the agents could go ahead and search, and this demonstrated his understanding of the request. He understood what the agents were looking for and the nature of their investigation, because Soria first asked if the garage contained drugs, guns, or money. Lopez had been in this country for over 20 years, and while he did not have a high level of education, he had the capacity to run a business and communicate verbally with customers. The request to search was not phrased in a manner too complex for Lopez to comprehend.

After the garage search, which took only a few minutes, Soria turned his attention to the house. He repeated his pattern of statements and questions—letting Lopez know that he was not under arrest and did not have to answer questions, and then asking individual questions about whether there were drugs, money, or guns in the house. Tr. 89–90. Lopez lied to Soria and said there was nothing illegal in the house. Tr. 131, 229.[7] Soria then asked if the agents could search the house for the things that Lopez said he did not have—again asking for consent in a less than clear manner, but one that nevertheless adequately communicated to Lopez what was

---

[7] That Lopez falsely denied that the contraband was in the house is understandable—particularly if Lopez was trying to be cooperative while at the same time hoping the agents would leave empty handed—but it undermines his credibility generally.

11

being requested. Lopez agreed.[8] This consent, like the consent to search the garage, was freely and voluntarily given. Lopez understood what was being asked, Soria and the other agents were not overbearing in their manner, and while Lopez was not told he was free to refuse to consent, he was told repeatedly that he did not have to answer questions. Soria could have avoided complications by simply presenting Lopez with the consent form right there, but his request was nevertheless sufficiently clear (particularly after agents searched the garage and Lopez could see how the agents conducted themselves) to elicit a voluntary decision by Lopez.

Lopez let the agents inside the home. After an agent found a large amount of currency in a bedroom, Lopez became more nervous but he remained cooperative. Tr. 24. Soria questioned Lopez about the money—questioning that was permissible and did not push the encounter beyond the consensual interview it had become by that point. Soria asked about guns or drugs, and Lopez then admitted that there was "China" (heroin) in the kitchen. Tr. 91. Soria asked Lopez to show the agents the heroin in the kitchen, and Lopez pointed it out. *Id*. Soria then asked if there was anything else in the house. Lopez admitted that there was more heroin in the basement and a gun in a bedroom. Tr. 92. Lopez led agents into the basement and showed them the heroin. *Id*.

---

[8] Lopez testified that Soria ordered Lopez to let them in the house and said that they were going to search it. I do not credit this testimony. As noted above, Soria knew that voluntary consent was his only route to admissible evidence, and conducted his interview of Lopez accordingly. With hindsight, Lopez has painted a more aggressive portrait of Soria—one that I find not credible.

12

The agents did not threaten to destroy the house unless Lopez showed them the contraband. That testimony from Lopez was an exaggeration. Soria explained that cooperation and assistance would be simpler and less disruptive, Tr. 138, but this was not a coercive threat. Soria's credibility on this point is bolstered by the manner in which the agents conducted the search. They in fact took Lopez's word that the money, heroin, and gun were the sum total of the evidence in the house. They did not search for ledgers, cutting agents, money counters, or hidden compartments, and they did not keep searching after Lopez pointed out the heroin in the basement—they did nothing to confirm that Lopez had given them everything. They limited the search to the items they asked for, treating Lopez as a cooperating source. The agents did not exceed the scope of the consent Lopez had given.

The recovery of the money, the heroin, and the gun provided probable cause to arrest Lopez, and he was taken to a police station. At the station, Lopez executed a consent-to-search form and a written waiver of his *Miranda* rights.[9] He made additional statements—the voluntariness of which is established by Lopez's cooperativeness, the lack of any coercive or illegal conduct by the agents that led to the statements, and the *Miranda* waiver—and then was released, with the hope that he would continue to cooperate (like the courier the night before). Throughout the

---

[9] The consent form executed at the police station does not shed light on the voluntariness of the consent given at the garage and home. By the time Soria presented Lopez with the form, the search was done, Lopez knew that the agents had the contraband, and there was no point to Lopez withholding or retracting his consent.

13

encounter, which lasted only a few hours, Lopez was cooperative and exercised his own free will to provide consent and statements.

The evidence at issue was not the product of illegal conduct by the agents, and therefore, the Constitution does not require suppression of the money, drugs, gun, and statements. Defendant's motion to suppress evidence, [23], is denied.

ENTER:

Date:   12/13/2016

Manish S. Shah
United States District Judge